```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                      HOUSTON DIVISION

DOROTHY CARTER,                  §
                                 §
       Plaintiff,                §
                                 §
v.                               §      CIVIL NO. H-05-3720
                                 §
JO ANNE B. BARNHART,             §
COMMISSIONER OF THE SOCIAL       §
SECURITY ADMINISTRATION,         §
                                 §
       Defendant.                §
```

### MEMORANDUM OPINION

Pending before the court[1] are Plaintiff's motion for summary judgment (Docket Entry No. 20) and Defendant's motion for summary judgment (Docket Entry No. 21). The court has considered the motions, all relevant filings, the administrative record, and the applicable law. For the reasons set forth below, Defendant's motion for summary judgment is **DENIED** and Plaintiff's motion for summary judgment is **GRANTED**. The court **REVERSES** Defendant's administrative decision, **AWARDS** Plaintiff benefits beginning December 4, 2002, and **REMANDS** the case to the Commissioner for calculation of those benefits.

### I. Case Background

**A. Procedural History**

In this action, Dorothy Carter ("Plaintiff") seeks review of

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgement, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docket Entry No. 16.

the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for a period of disability and disability insurance payments under Title II of the Social Security Act ("the Act").

Plaintiff filed her application on January 7, 2003.[2] After the application was denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[3] The ALJ granted Plaintiff's request and conducted a hearing in Houston, Texas, on August 10, 2004.[4] After listening to testimony presented at the hearing and reviewing the medical record, the ALJ issued an unfavorable decision on September 24, 2004.[5] The ALJ found Plaintiff was not disabled at any time during the period covered by her application, and Plaintiff appealed that decision on September 28, 2004.[6]

On September 30, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner.[7] Plaintiff filed this timely civil action pursuant

---

[2]   Transcript of the Administrative Proceedings ("Tr.") 53.

[3]   Tr. 22, 32, 36.

[4]   Tr. 731.

[5]   Tr. 13-19.

[6]   Tr. 9.

[7]   Tr. 5-7.

to 42 U.S.C. § 405(g) for judicial review of the Commissioner's unfavorable decision.

**B. Factual History**

<u>1. Plaintiff's Age, Education, and Work Experience</u>

Plaintiff was born on November 28, 1948, and allegedly became unable to work shortly after her fifty-fourth birthday.[8] She completed the tenth grade, took vocational nursing classes for eight months, and was certified to carry a firearm as a security officer.[9] Prior to the onset of her disability, Plaintiff was employed for eleven years as a facility manager, for more than one year as a visiting nurse, and for more than seven years as a security officer.[10]

<u>2. Plaintiff's Testimony</u>

During the ALJ hearing, the judge solicited testimony from Plaintiff, a medical expert ("ME"), and a vocational expert ("VE"). In addition to experiencing chronic pain and a compromised immune system due to breast cancer, mobility impairments of her right arm, broken ribs, lymphedema,[11] and problems with her bones, Plaintiff testified to also suffering from pain associated with several on-the-job injuries, a broken

---

[8] Tr. 66-67.

[9] Tr. 738.

[10] Tr. 79.

[11] Lymphedema is "[e]dema (swelling), usually of a limb or limbs, due to an abnormal accumulation of fluid in the tissues, which is the result of an obstruction of lymph vessels or lymph nodes." 3-L Attorneys' Dictionary of Medicine 4643 (LEXIS).

3

sternum, complications following her modified right radical mastectomy, radiation therapy, headaches, bleeding from the eye, high blood pressure, osteoarthritis, cervical radiculopathy, and bladder problems.[12] She explained that she had "about four or five" operations on her bladder, and that she needed to use the restroom every thirty to forty minutes because her bladder was smaller than normal.[13] She also stated that she had a bone scan in February 2001 because she "was having a lot of pain, and breaking a lot of bones. And even with all the medication that [she] was taking[,] it was just getting to be unbearable."[14]

When questioned about her previous work and then-current daily activities, Plaintiff testified that she "couldn't really do" her job in 2001.[15] She was working in "severe pain and . . . was taking then and still [took at the time of the hearing] pain medication every six hours around the clock."[16] Plaintiff said that, after being injured on the job in January 2002, she returned to work in "lots of pain" and had problems doing the

---

[12] Tr. 66, 743 (neck and back injuries), 746-747 (torn rotator cuff), 748 (open wound and burning following mastectomy), 750 (broken rib, severe migraines and bleeding from the eye), 751 (depression, sternum injury, and mass in the abdominal wall), 752 (automobile accident resulting in chest pain and broken rib), 753 (bladder problems), 755 (arthritis), 755-756 (high blood pressure, chest and rib injuries), 757-758 (cervical radiculopathy), 763 (migraine headaches).

[13] Tr. 754.

[14] Tr. 754.

[15] Tr. 755.

[16] Tr. 755.

required charting.[17]  After she was diagnosed with cervical radiculopathy in March 2002, she dropped "a lot of stuff" and had difficulty "lifting and picking up the charts, and pulling."[18]

Plaintiff recalled that during this last year of work, she "simply couldn't do the job effectively, or anymore."[19]  She felt it necessary to take longer breaks than the other employees because of the pain and effects of the medication.[20]  She cried a lot, and despite her doctors' attempts to alter her medications, the pain and drug side effects persisted.[21]

Plaintiff testified that she began getting written up "quite a bit" and had "quite a few conferences" related to her absences and her ability to perform her work.[22]  She stated that she "was asked if [she] thought maybe [she] ought to leave, and go on disability."[23]  "To keep from being terminated, or leaving with a bad record," Plaintiff stopped working on December 4, 2002.[24]

At the time of the hearing, Plaintiff reported taking fifteen medications, including: Zoloft for depression; Nadolol and Dilaudid for migraine headaches; Clonidine and Lisinopril for

---

[17]   Tr. 757.

[18]   Tr. 758.

[19]   Tr. 759.

[20]   Tr. 760.

[21]   Tr. 760.

[22]   Tr. 758.

[23]   Tr. 758.

[24]   Tr. 759.

hypertension; Ambien to sleep; Ultram, Amitriptyline, and Robaxin for pain; Atarax for allergic reactions; and Nitroglycerine for heart problems.[25]  Plaintiff stated that, despite taking these medications, she continued to have difficulty sleeping, to experience severe migraine headaches once or twice per month, and to "always [be] in pain."[26]  She also testified that Lisinopril had a diuretic effect and Ultram made her dizzy to the extent that she had to lay down three to four hours out of a typical eight-hour day.[27]

In response to the ALJ's questions, Plaintiff stated that she was able to shower herself with difficulty, could fix her own meals, studied her bible, did some laundry, and sometimes went to church or visited her mother.[28]  She did not do her own grocery shopping; nor did she go outside or walk very often.[29]

### 3. Medical Evidence and Opinions

Plaintiff's medical records appear to support her testimony. When asked to provide his "expert opinion on the medical condition of" Plaintiff, John Anigbogu, M.D., ("Dr. Anigbogu"), the ME, summarized her medical history, explaining:

---

[25]  Tr. 760-761, 763, 764, 765, 766, 767.  Although the transcript recorded "Delotid [phonetic]" and "Clomadine [phonetic]," the court assumes Plaintiff was referring to Dilaudid and Clonidine.  See, e.g., tr. 506.

[26]  Tr. 762, 764, 765.

[27]  Tr. 765.

[28]  Tr. 769-770.

[29]  Tr. 770.

> She's an unfortunate 55 year old female with multiple medical problems. She has a right breast cancer. . . . She had a modified right mastectomy with a lymph node dissection, after which she had chemotherapy and radiation therapy. She subsequently developed some lymphadema in the chronic wound and ended up having a litissimus dorsal flap on the right breast to decrease the wound. She also has osteoarthritis at multiple places, including the cervical spine and the lumbar spine, which were all confirmed by MRI, but there was no cord compression or foramina stenosis. She has a right rotator cuff tear, for which she had arthroscopic right rotator cuff repair. She also had a fat necrosis and an abdominal wall mass, which they went and did an incision on drainage. And [she also had] a urethra stenosis. She's had a lot of [cystscopy] and dilation of the urethra stenosis. She also has hypertension, and has depression which is treated by a doctor. And also a history of a rib fracture on the lateral costal condritis.[30]

Dr. Anigbogu also opined, though, that none of Plaintiff's impairments met any of the relevant Listings.[31]

Plaintiff's medical records were also examined by Paul Sundin, M.D., ("Dr. Sundin"), a state agency physician.[32] On a Residual Functional Capacity ("RFC") Assessment form signed February 18, 2003, Dr. Sundin wrote that Plaintiff's "alleged symptoms/limitations are partially supported by the [Evidence On Record]," but did not further comment on his credibility determination.[33] He found that Plaintiff was limited to lifting not more than twenty pounds occasionally and ten pounds

---

[30] Tr. 772.

[31] Tr. 773. "The Listings" or "a Listing" refers to impairments listed in Appendix 1 of the Social Security Act regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[32] See Tr. 372-379.

[33] Tr. 377.

frequently, that she could stand and/or walk, and sit each for "about six hours in an eight-hour workday," and that she could push and/or pull without limitation.[34]  Dr. Sundin determined that Plaintiff was also capable of unlimited manipulation, with the exception of occasional overhead reaching "due to c-spine and shoulder pain."[35]

On April 26, 2004, Plaintiff's treating physician, Octavio Barrios, M.D., ("Dr. Barrios"), completed a similar RFC Evaluation form, but estimated that Plaintiff was limited to sitting for only one hour and standing for only forty-five minutes.[36]  Dr. Barrios also indicated that Plaintiff had "*significant limitations* in doing *repetitive* reaching, handling or fingering," could never lift even less than five pounds, and was substantially limited in her ability to use her hands, fingers, and arms for grasping, manipulating, or reaching.[37]  His evaluation also specified that, on average, he anticipated Plaintiff's impairments would cause her to be absent from work "more than three days a month."[38]

When asked to comment on Dr. Barrios' assessment, Dr. Anigbogu testified that he agreed with the diagnosis but had

---

[34] Tr. 373.

[35] Tr. 375.

[36] Tr. 711.

[37] Tr. 712.

[38] Tr. 712.

"some disagreement" with the characterization of Plaintiff's limitations.[39] This disagreement, the ME explained to the ALJ, was based primarily on an absence of an "official functional capacity evaluation" that documented problems with Plaintiff's ulnar nerve.[40] According to the ME, Plaintiff's doctors "didn't do the studies to find out if she has any problems" with her ulnar nerve or manipulations.[41]

At the urging of Plaintiff's attorney, Dr. Anigbogu confirmed that Plaintiff "definitely" could experience pain in her right shoulder and stated that problems with dropping objects could be attributed to Plaintiff's osteoarthritis, among other diagnoses.[42] The doctor also reiterated that Plaintiff suffered from "significant arthritis on her cervical spine," which would most commonly manifest itself as "pain and stiffness."[43]

When questioned about Plaintiff's urethra stenosis, the ME opined that, because of her bladder problems, "she's going to be urinating a whole lot. So she can go anywhere from ten times during the day -- ten to fifteen times during the day, to about five to six times at night, based on that."[44]

---

[39]    Tr. 782.

[40]    Tr. 778.

[41]    Tr. 778.

[42]    Tr. 776, 777.

[43]    Tr. 775.

[44]    Tr. 774.

5. Vocational Expert's Testimony

After reviewing the file and listening to the testimony, the VE, Herman Litt, opined that Plaintiff's prior work as a security operator was light, semi-skilled work; as a facility manager, was light, skilled work; and as a nurse aide was performed as heavy, semi-skilled work.[45]

The VE was asked by the ALJ if a hypothetical individual of Plaintiff's age and educational background, and with Plaintiff's work history, would be able to perform certain jobs at the medium exertional level assuming that the individual would also be restricted to "no crawling, balancing, or climbing of ladders or scaffolds . . . [and] avoidance of hazards such as heights, vibrations, and dangerous machinery . . . in a friendly environment, free from poor ventilation, dust, fumes, [and] outside temperature extremes."[46] Presented with this hypothetical, the VE opined that such an individual would be able to perform Plaintiff's past work as a security operator, a facility manager, and also as a nurse aide as commonly performed in the economy.[47] The VE also testified that at least three other jobs existed in significant numbers in the regional and national economy that such a hypothetical individual could

---

[45] Tr. 784.

[46] Tr. 785.

[47] Tr. 785.

perform at the medium, semi-skilled level.[48]

The ALJ then presented the VE with the same hypothetical claimant, but changed the exertional restriction from medium to light.[49] Based on this revised assumption, the VE opined that the "past relevant work that was at the light level . . . she would be able to do as well."[50] He also stated that such a hypothetical claimant would be able to work as a companion, blind aide, or playroom attendant for children, as each of those occupations was classified at the light, semi-skilled level.[51]

After the ALJ completed his questioning of the VE, Plaintiff's attorney presented a series of additional hypothetical scenarios to the expert, and the VE responded:

> Q [by the attorney]:   . . . Assume that the claimant would be absent from work for more than three days a month, would there be any jobs in the national economy she could perform?
>
> A [by the VE]: No.
>
> Q:   . . . Assume that the claimant can lift less than five pounds on a frequent basis at the most. Would she be able to perform any of the jobs you testified to under the Administrative Law Judge's hypotheticals?
>
> A:   No.
>
> Q:   And the reason?
>
> A:   They would all require lifting at a much higher level than five pounds.

---

[48]   Tr. 786.

[49]   Tr. 787.

[50]   Tr. 787.

[51]   Tr. 787.

> Q: Assume also that the claimant, because of urethra stenosis would have to use the restroom ten times per day. And let's assume five minutes on each occasion at a minimum. How would that affect her ability to perform any job in the national economy? She'd have to get up from her desk, leave the work station ten times per day to go use the restroom?
>
> A: It would make it very difficult to maintain employment.
>
> Q: And when you said difficult to maintain it, would there be any jobs she could perform on a daily basis, with that type of restriction?
>
> A: She would have to have an extremely understanding employer, to be able to do that, so generally no.
>
> Q: So you said generally an understanding employer. When you look at the [Dictionary of Occupational Titles], are there any jobs that she would be able to perform based on that hypothetical?
>
> A: No, no, she wouldn't.[52]

After the attorney presented several additional scenarios to the VE, the ALJ adjourned the hearing and, on September 24, 2004, rendered his decision.

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to deny disability benefits is limited to two issues: 1) whether proper legal standards were used to evaluate the evidence; and 2) whether substantial record evidence supports the decision. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

---

[52] Tr. 788-789.

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000); Brown, 192 F.3d at 496. In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown, 192 F.3d at 496. The Commissioner is given the responsibility of deciding any conflicts in the evidence. Id. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405 (g). Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making the court's review meaningless. Brown, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated

13

according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [20 C.F.R. Pt. 404, Subpt. P, App. 1] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

To be entitled to benefits, a claimant bears the burden of proving she is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps and the Commissioner bearing it on the fifth. Brown, 192 F.3d at 498; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The analysis stops at any point in the five-step process upon a finding that the claimant is or is not disabled. Greenspan, 38 F.3d at 236.

In certain cases, an ALJ may use the medical-vocational guidelines (the "Grid")[53] to determine whether a claimant is capable of performing other work. Watson v. Barnhart, 288 F.3d 212, 216 (5th Cir. 2002). The Grid is applicable if the

---

[44] 20 C.F.R. Pt. 404, Subpt. P, App. 2.

"claimant suffers only from exertional impairments, or . . . the claimant's nonexertional impairments do not significantly affect his residual functional capacity."  Id. (quoting Crowley v. Apfel, 197 F.3d 194, 199 (5th Cir. 1999)).  In cases where nonexertional factors can limit the range of jobs a claimant can perform, "the ALJ must rely on expert vocational testimony to establish that jobs exist." Scott v. Shalala, 30 F.3d 33, 35 (5th Cir. 1994).

### III. Analysis

In this case, the ALJ found that Plaintiff met the special earnings requirements of the Act and had not engaged in substantial gainful work since the alleged onset date of her disability.[54]  The ALJ found that Plaintiff had a "history of right breast cancer and modified mastectomy, lymphedema, osteoarthritis of the cervical and lumbar spine, . . . a right rotator cuff tear with arthroscopic surgery, fat necrosis and abdominal wall mass incision and drainage, urethral stenosis, hypertension, depression, and . . . a rib fracture with costochondritis."[55]  Although the ALJ considered those impairments to be "severe" according to the regulations, he determined that they did not meet or equal any of the Listings.[56] According to the ALJ, Plaintiff retained an RFC that allowed her

---

[54]   Tr. 18.

[55]   Tr. 18.

[56]   Tr. 18.

to perform her past relevant work, and, therefore had not been under any disability as defined by the Act at any time through the date of the decision.[57]

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits, contending that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.  Defendant, on the other hand, contends that the ALJ employed proper legal standards in reviewing the evidence and that the decision is supported by substantial evidence of record.  Defendant therefore maintains that the ALJ's decision should stand.

Plaintiff first alleges that the ALJ's decision is premised on a defective hypothetical question, and the determination of non-disability, therefore, is not based on substantial evidence. Specifically, Plaintiff claims that when the ALJ questioned the VE, he failed to include any limitations associated with Plaintiff's urethral stenosis.

An ALJ may properly rely on the testimony of a VE when determining if a claimant is capable of working.  See Bowling, 36 F.3d at 436.  The Fifth Circuit established, though, that a determination of non-disability based on a hypothetical question may only stand in certain circumstances.  Id.  The Bowling court found that hypothetical questions posed to the VE by the ALJ must "incorporate reasonably all disabilities of the claimant

---

[57] Tr. 18.

recognized by the ALJ, and the claimant or his representative [must be] afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Id.  An ALJ's reliance on a hypothetical that fails to satisfy these requirements constitutes reversible error.  Id.

At the hearing, the ALJ posed two hypothetical questions to the VE.  The first assumed an individual who was capable of performing at the medium exertional level, was of Plaintiff's age, education, and vocational background, and was restricted to no crawling, balancing, or climbing of ladders or scaffolds.[58] The individual was also limited to working in a "friendly environment, free from poor ventilation, dust, fumes, [and] outside temperature extremes," and to "avoiding hazards, such as heights, vibrations, and dangerous machinery."[59]  The second scenario considered the same individual, but further restricted her maximum exertional ability to only the light level.[60]  In both cases, the VE opined that the hypothetical individual would be capable of performing Plaintiff's past relevant work.[61]  The

---

[58]   Tr. 785.

[59]   Tr. 785.

[60]   Tr. 787.

[61]   Tr. 785-787.

VE also provided additional examples of jobs available in the national and regional economies that comported with each of the ALJ's hypotheticals.[62]

Absent from the ALJ's scenarios, though, was any limitation associated with Plaintiff's history of urethral stenosis. The Commissioner is granted the authority to determine which disabilities and limitations are supported by the evidence, and the court should overturn the Commissioner's determinations "only where there is a conspicuous absence of credible choices or no contrary medical evidence." Johnson, 864 F.2d at 343-344 (internal quotation marks omitted); see also Brown 192 F.3d at 496.

In this case, the ALJ's findings recognized that Plaintiff suffered from a history of urethral stenosis that was "considered 'severe' based on the requirements of 20 CFR § 404.1520(c)."[63] The ME opined that, in Plaintiff's case, this condition would necessarily require frequent restroom breaks, and Plaintiff confirmed through her testimony that she needed to use the restroom every thirty to forty minutes during the day.[64] Her medical records also registered consistent complaints related to her urinary function.[65] Despite the ME's corroborating testimony

---

[62] Tr. 786, 787.

[63] Tr. 18.

[64] Tr. 753, 774.

[65] See, e.g., tr. 254, 328, 337.

18

and absence of any contradictory evidence, the ALJ failed to incorporate into his hypotheticals any limitation associated with Plaintiff's urethral stenosis impairment.

The ALJ's recognition of limitations must be supported by substantial evidence. See Johnson, 864 F.2d at 343-344. In this case, the ALJ found that Plaintiff's history of urethral stenosis constituted a "severe" impairment, and expert medical testimony established that, with Plaintiff's medical profile, a limitation recognizing the need to frequently urinate automatically attached to her impairment. Considering the absence of contradictory evidence in the record or any alternate explanation or discussion by the ALJ, the court cannot find even a scintilla of evidence that would support the ALJ's decision to omit this limitation.

Such an omission clearly prejudiced Plaintiff and constitutes reversible error. When Plaintiff's attorney corrected the deficiency in the hypothetical, the VE testified that an individual who required up to ten restroom breaks per day would not be able to perform any jobs listed in the Dictionary of Occupational Titles.[66]

Because the court has found that, based on the ALJ's

---

[66] Tr. 788-789. Ten restroom breaks per day was the minimum number expressed by the ME. Tr. 774. Defendant's argument that Plaintiff's claim is weakened by evidence that she was able to work after being diagnosed with the allegedly disabling impairments is appealing. See Defendant's Motion for Summary Judgment (Docket Entry No. 21), pp. 6-7. The court is concerned, though, with effect of her impairments only from the time of the alleged onset of her disability and finds that the VE testimony clearly established that the disabilities recognized by the ALJ precluded her from engaging in any substantial gainful activity during the relevant period. Plaintiff, therefore, carried the burden necessary to establish her claim for benefits.

19

findings related to Plaintiff's impairments, Plaintiff carried her burden of proving she was disabled under the Act, it is not necessary to further consider Plaintiff's additional arguments. Furthermore, Defendant's motion for summary judgment does not persuade the court that substantial evidence in the record as a whole otherwise exists in support of the Commissioner's determination.

### IV. Conclusion

For all of the foregoing reasons, the court **DENIES** Defendant's Motion for Summary Judgment, **GRANTS** Plaintiff's Motion for Summary Judgment, **REVERSES** Defendant's administrative decision, **AWARDS** Plaintiff benefits beginning December 4, 2002, and **REMANDS** the case to the Commissioner for calculation of those benefits.

SIGNED at Houston, Texas, this 23rd day of January, 2007.

_____
Nancy K. Johnson
United States Magistrate Judge